UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

FELIX J. BRUETTE, JR.,

      Plaintiff,

  v.                              Case No. 14-CV-876

SALLY JEWELL, Secretary of the Interior,

      Defendant,

VALERIE J. BRUETTE, IVAN D. BRUETTE,
and ARTHUR J. BRUETTE,

      Movants.

---

## DECISION AND ORDER GRANTING MOTION TO DISMISS

---

Plaintiff Felix J. Bruette, Jr., brought this pro se civil action against Sally Jewell, the Secretary of the United States Department of Interior (DOI). Bruette states that he is "the great great Grandson and direct lineal descendant of Stephen Gardner," who was "a signatory under Article V of the Treaty of February 5th, 1856 and declared to be an 'actual' member of the Stockbridge and Munsee Tribe by the United States Congress on March 3rd, 1893." (ECF No. 1 at 3.) As a linear descendent of Stephen Gardner, Bruette claims he is entitled to certain rights and privileges, including a pro rata share of tribal funds and the right to occupy tribal lands. Bruette brought this action in an attempt to vindicate those rights. For the reasons set forth below, however, I conclude that this court lacks jurisdiction over his claims and that his action must be dismissed.

## I. BACKGROUND

Some understanding of the history of the Stockbridge and Munsee Tribe in Wisconsin is necessary to understand Bruette's claim. Fortunately, that history has been recounted in two previous decisions concerning a dispute with the State of Wisconsin over the boundaries of the Tribe's reservation in western Shawano County. *See Wisconsin v. Stockbridge-Munsee Community*, 366 F.Supp.2d 698 (E.D. Wis. 2004), *aff'd*, 554 F.3d 657 (7th Cir. 2009). A long and detailed version of that history appears in Magistrate Judge Patricia Gorence's decision granting the State's motion for summary judgment, and a more abridged version appears in the Seventh Circuit's decision affirming it. An abridged version of the abridged version is sufficient for our purposes here.

The Stockbridge-Munsee Indians (the Tribe) are comprised of descendants of the Mohican Tribe who migrated westward and eventually arrived in Wisconsin in the 1820s. In 1856, the United States entered into a treaty and created a reservation for the Tribe consisting of two townships (Bartelme and Red Springs) in Shawano County, Wisconsin, some 40 miles northwest of Green Bay. Treaty with the Stockbridge and Munsees, Feb. 5, 1856, 11 Stat. 679. In 1871 Congress passed an act providing for the public sale of most of the land (with the proceeds to be distributed to or held in trust for tribal members), allotment of the remaining land to tribal members who elected to remain, and a new enrollment of the Tribe. Act of Feb. 6, 1871, ch. 38, 16 Stat. 404. Those entrusted with creating the tribal roll, however, excluded more than half the Tribe, including Bruette's ancestor. In 1893, in response to reports that the exclusion of many of the tribal members was obtained by fraud, Congress passed another act in an attempt to restore them to tribal membership. Act of Mar. 3, 1893, ch. 219, 27 Stat. 744. The 1893 Act required the Secretary of Interior to create a new roll of the Tribe to include all those who were or became members of the Tribe at the time of the Treaty

of 1856 and their descendants who have not separated from the Tribe. The Act also provided that all members "who entered into possession of lands under the allotments of 1856 and 1871, and who by themselves or their lawful heirs have resided on said lands continuously since, are hereby declared to be owners of such lands in fee simple, in severalty, and the Government shall issue patents to them therefor." *Id.* In the event of a conflict between the allotments under the 1871 act and the allotments of 1856, the act provided that the latter shall prevail. *Id.* at 745.

It soon became apparent, however, that there would not be enough land for those who had claims under the 1893 Act. This is not surprising since the addition of those previously excluded increased tribal membership, while at the same time three-quarters of the Tribe's land had been sold in 1871. Although the enrollment was apparently completed, the allotment process proved difficult, and was ultimately suspended pursuant to a Senate Resolution. *See* 1895 Annual Report of the Commissioner of Indian Affairs, ECF No. 12-25.

In 1900, with the DOI's approval, the Tribe presented Congress with a proposal to settle all of the United States' obligations to the Tribe under the 1856 treaty, any act of Congress, or otherwise. The plan called for allotments of the unsold portion of the reservation and of additional land to be purchased by the United States, or cash in lieu of land. Unlike under previous laws, the proposed allotments would be alienable. Congress failed to act on the proposal for several years due to concern about how to fund the measure. *See Stockbridge-Munsee Community*, 554 F.3d at 661. Congress ultimately enacted the plan into law in 1906, with funding to come from the Tribe's treasury. *See* Act of June 21, 1906, ch. 3504, 34 Stat. 325, 382–83. Following these allotments, until the 1930s, the reservation was essentially treated as nonexistent. But after the enactment of the Indian Reorganization Act of 1934, the Stockbridge-Munsee people organized the "Stockbridge-

3

Munsee Community," a federally recognized Indian tribe residing on what remains of its 1856 reservation in Shawano County, where it is located today.

It is the provisions of the 1893 Act that Bruette seeks to enforce. Bruette alleges that neither he nor his ancestors have separated from the Treaty of 1856, and claims that he still resides within the original boundaries of that treaty, as did his father, grandmother, great grandfather and Stephen Gardner. (ECF No. 1 at 3.) He then asserts the following three claims:

1. I claim that in 1895 the Department of Interior unlawfully suspended the Act of Congress, March 3, 1893, under the guise of a senate resolution. January 31, 1895. "Whereas complaint is made of the results of the carrying out by the Secretary of the Interior the act of Congress entitled an act for the relief of the Stockbridge and Munsee Indians, in the State of Wisconsin, approved March 3rd, 1893."

2. I further complain that the Department of Interior has no legal authority to suspend any act of Congress.

3. I and all the descendants of Stephen Gardner claim the Department of Interior is in breach of its fiduciary duties by failing to establish the official roll of actual members under the provisions Congress ordered.

(*Id.*) In a space for listing the "Relief You Request," Bruette wrote: "Order the Department of Interior to be in compliance with the law. Comply with Congress and the Act of March 3rd, 1893. Establish the official roll with the provisions ordered." (*Id.* at 4.)

Secretary Jewell responded to the complaint with a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, alternatively, for summary judgment. The Secretary argued that the case was moot because the roll required by the 1893 had in fact been taken. Although the Secretary acknowledged that the Senate did temporarily suspend enrollment and allotment activities under the 1893 Act with the 1895 resolution, the suspension was lifted on February 12, 1895, at which time the Commissioner of Indian Affairs proceeded to issue land patents and per capita payments as provided for under the

1893 law. In support of this contention, the Secretary submitted a certified reproduction of a National Archive record entitled "Census of the Stockbridge and Munsee Indians, entitled to enrollment under the Census of 1856, taken by C. C. Painter, U.S. Indian Agent, under the act of March 3, 1893, as revised by the Commissioner of Indian Affairs." (ECF No. 10-1.) The census includes a list (consisting of odd-numbered pages from 3 to 47) of tribal members, including the descendants of Stephen Gardner. (*Id.* at 9.) The Secretary also submitted in support of her motion a copy of a land patent issued by President James Buchanan in 1860 granting to "Stephen Gardner and to his heirs and assigns forever" sixty acres of land from the Township on the east side of Lake Winnebago that had been granted to the Stockbridge by the Treaty of 1831 with the Menominee Tribe of Indians. (ECF No. 10-2.) Based on these documents, the Secretary argued that the relief sought by Bruette had already been granted and that the case should be dismissed as moot because there is no justiciable controversy over which this court can exercise jurisdiction. Alternatively, the Secretary argued that the action was barred by the six-year statute of limitations for claims against the Government under 28 U.S.C. § 2401(a).

In response to the motion, Bruette argued that the Secretary was interpreting his claim too narrowly by focusing on the taking of the roll alone. Bruette wrote: "The rights I ask the court are the same rights Congress affirmed to my Grandfathers on March 3, 1893. The right to occupy tribal lands established by treaty, lands held in common with individual land selections, and to share in pro rata tribal funds." (ECF No. 12 at 1) (citations omitted). Bruette proceeded to dispute the Secretary's interpretation of the meaning of the 19th century documents the Secretary introduced, including the land patent apparently issued to his great grandfather. Bruette also countered with twenty-six exhibits of his own. Unable to ascertain Bruette's claim, the court scheduled the matter

5

for a hearing.

At the outset of the hearing, counsel for the Secretary conceded that the Secretary was abandoning any argument based on the land patent issued to Stephen Garder by President Buchanan in 1860, since it was for a parcel of land located in Calumet County pursuant to an earlier treaty. The Secretary maintained her position that the roll ordered under the 1893 act had been completed. (*See* Tr. at 3–4, ECF No. 19.)

Bruette, now joined by his brother and sister who seek to join him in his action against the Secretary, offered a lengthy explanation of what his case was about. He explained the 1893 law, under which Congress established provisions to determine the "actual" members of the Tribe, re-affirmed the members' right under the treaty of 1856 to occupy land and exist as a tribe. He stated that his grandfather, Stephen Gardner, re-located, settled and improved a piece of land pursuant to the 1856 treaty; that Stephen had fought in the Civil War from 1862 to 1865; and that he was ultimately forced off his land pursuant to a patent issued under the 1871 law, which was obtained by fraud on the Tribe by a political faction of the Tribe.

When asked directly what he wanted the court to do in his case, Bruette said:

We would be granted the rights that our grandfather had that was reaffirmed by Congress not only in 1893, those rights were reaffirmed in 1906 and 1916, and yet the Department of Interior has failed to be in compliance with those provisions which established our sovereignty and jurisdiction as tribes.

We are a tribe. We are the last members of that tribe. But we never took the land. We never took the money. We have nothing today. Our grandfathers stood outside in 1871, were being ran off their own reservation. The house that he built he was being taken – and we are still in that same position today because the Department of Interior failed to be in compliance with those provisions. Those provisions separated those members who received from the tribe and those members who had never have. And those who have not received are to maintain their tribal rights, their treaty rights.

6

(Tr. 21–22.)

Thereafter, Bruette and his siblings re-iterated that what they were actually seeking was tribal recognition. When the court asked about the Stockbridge-Munsee "Tribe" that exists today, Bruette and his siblings corrected the court and noted that it was not a tribe, but a "community." The court stated "So you're seeking tribal recognition," and all three answered "yes." (Tr. 23.) The court asked what recognition would mean, and Bruette responded: "It would give us an opportunity to raise our family out of poverty. Because the [DOI] failed to carry out those provisions in 1893 we remained in poverty – we were excluded from being a member of our own tribe." (Tr. 24.) Bruette explained that he and many members of his family were not members of the community, created in 1934, and that because the DOI failed to carry out the 1893 law, he and his family have been left wandering ever since. This occurred despite the fact that neither Bruette nor his descendants, going back to Stephen Gardner, ever separated from the Tribe or ever had their rights under the 1856 treaty extinguished by the allotment of land in fee simple. (Tr. 26.) Bruette indicated that what he sought was tribal recognition at several other points in the hearing. (Tr. 34, 36–37, 46.)

Based on Bruette's more complete explanation of his claim against the Secretary, both parties were offered the opportunity to supplement their arguments in favor or and in opposition to the Secretary's motion to dismiss. In her supplemental brief, the Secretary now construes Bruette's claim as one for tribal recognition and argues that there are additional grounds on which her motion should be granted: it is barred under the political question doctrine; the United States is immune from such suits; and that Plaintiff has not exhausted administrative remedies under the Administrative Procedures Act. (ECF No. 20.) In his own supplement, Bruette did not respond to the Secretary's new arguments except to reiterate his arguments that the claim is not moot and noting that the rights

7

of Stephen Gardner's descendants are based on the 1856 treaty and that "[n]o Administrative Law or Procedure can interfere with those rights." (ECF No. 21 at 7.) In reply, the Secretary rested on the arguments in her supplemental memorandum and only added that additional research revealed that Bruette did send a letter to the Office of Federal Acknowledgment (OFA) in January 2003 expressing his and other members of the "Muhheconnuck and Munsee Tribes" intention to petition for tribal recognition. (ECF No. 25.) However, as explained in the declaration of the director of the OFA, neither Bruette nor any other member of this group pursued the administrative process any further. (ECF No. 26.)

## II. ANALYSIS

### A. Jurisdiction

The threshold issue the court must address is whether it has jurisdiction over the claim Bruette has asserted. Federal courts are courts of limited jurisdiction, which means they can only hear and decide the kinds of cases that the Constitution and Congress authorize them to hear. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). This court's original jurisdiction extends to cases that "arise under" federal law, of course, but the plaintiff in such a case must also identify some statute creating a federal cause of action. *Int'l Union of Operating Eng'rs v. Ward*, 563 F.3d 276, 281 (7th Cir. 2009) ("[W]hen the basis of the action is a federal statute, a federal cause of action must exist as well for a federal court to hear a given claim; the general grant of federal question jurisdiction contained in [28 U.S.C. § 1331], without a federal cause of action, is not enough."). Additionally, "Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003)

8

(internal citations omitted).

Neither party has suggested any basis for this court's jurisdiction. Two provisions come to mind, however. Congress granted a limited waiver of sovereign immunity in the General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U.S.C. § 331 *et seq*. That Act grants jurisdiction to the district courts over suits "involving the right . . . to any allotment." 25 U.S.C. § 345, 28 U.S.C. § 1353 ("The district courts shall have original jurisdiction of any civil action involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any Act of Congress or treaty."). But Bruette has not sued for an allotment. Even if he had, he has no claim. The 1893 Act Bruette seeks to enforce required issuance of patents to unseparated members of the Tribe or their descendants who had been continuously residing on Tribal lands at that time. Nothing in the 1893 Act can be reasonably read as giving individuals who trace their lineage to Stephan Gardner a right to land after more than a hundred years. Moreover, the General Allotment Act gives federal courts jurisdiction only to determine whether an allottee has been deprived of rights acquired through an Indian allotment. *Arenas v. United States*, 322 U.S. 419, 432 (1944). In other words, it grants jurisdiction over "suits involving the interests and rights of the Indian in his allotment or patent after he has acquired it." *United States v. Mottaz*, 476 U.S. 834, 845 (1986) (internal quotation marks and citation omitted). Finally, even if a claim for issuance of a patent could be brought under § 345, the general six-year statute of limitations applicable to actions against the United States would bar any such action. *Christensen v. United States*, 755 F.2d 705, 707 (9th Cir. 1985) ("We have held that 28 U.S.C. § 2401(a), which provides a six-year statute of limitations to 'every civil action commenced against the United States,' applies to actions brought under section 345.") (citing *Loring v. United States*, 610 F.2d 649, 650 (9th Cir. 1979)).

9

A second possible source of jurisdiction is the Indian Tucker Act, 28 U.S.C. § 1505, which provides that the "United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States." United States district courts have concurrent jurisdiction over such claims not exceeding $10,000. 28 U.S.C. § 1346(a)(2). But the Tucker Act is merely a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009); *United States v. Mitchell,* 445 U.S. 535, 538 (1980). And as noted above, Bruette has no rights under the 1893 Act he seeks to enforce. *See also Wolfchild v. United States*, 731 F.3d 1280 (Fed. Cir. 2013) (holding that descendants of Indians for whom land was set aside did not have viable claim for money damages under the Indian Tucker Act, in action for breach of fiduciary duty or other duties with respect to distribution of proceeds generated by the lands, in absence of showing that a money-mandating duty in the appropriations acts required that proceeds from the lands be distributed to them as descendants of the designated Indians). Finally, even if Bruette had a claim under the Indian Tucker Act, that claim too accrued long ago and would be barred by the statute of limitations.

### B. Tribal Recognition

To the extent that Bruette and his siblings seek tribal recognition, which is not clear from his complaint, the Secretary is correct that this court has no authority to grant such relief. As explained in *Miami Nation of Indians v. United States Dep't of Interior*, the criteria for federal recognition are set forth in regulations promulgated by the executive branch of government under powers delegated

10

it by Congress. 255 F.3d 342, 345–46 (7th Cir. 2001); *see* 25 U.S.C. §§ 2, 9; 25 C.F.R. § 83.7(a)–(g). What's more, as the Seventh Circuit explained in *Miami Nation*, federal recognition "lies at the heart of the doctrine of 'political questions.'" 255 F.3d at 347. As it relates here, this doctrine "identifies a class of questions that . . . are not amenable to judicial resolution because the relevant considerations are beyond the courts' capacity to gather and weigh . . . ." *Id.* This means that even if Bruette and his siblings applied for federal recognition to the DOI and were denied, this court would be powerless to overturn the executive branch's determination.

Also, as the Secretary also points out, Plaintiff has not gone through the process of applying for federal recognition and been denied. The DOI's records indicate Bruette sent a letter to the DOI in 2003 indicating his intent to seek federal recognition, but Plaintiff never followed through with his application. Accordingly, the only avenue for judicial review that might be available—a claim under the Administrative Procedure Act, which provides limited judicial review to ensure an administrative agency like the OFA follows its own rules—is not available here, because the Act requires a statutory cause of action or a "*final* agency action," neither of which we have here. *Id.* at 348; 5 U.S.C. § 704. The same result obtains to the extent that Plaintiff seeks tribal recognition directly under the treaty of 1856, because "[w]here tribal status is at issue, the issue requires exhaustion of administrative remedies." *Robinson v. Salazar*, 885 F. Supp. 2d 1002, 1033 (E.D. Cal. 2012); *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 551 (10th Cir. 2001) (requiring exhaustion of administrative remedies even when plaintiff argued tribe had already received federal recognition under treaty).

For all of these reasons, I conclude that this court lacks jurisdiction over Bruette's claims. The action is therefore dismissed. So that Plaintiff's siblings can participate in any appeal, their

11

motions to join the action are **GRANTED** because they would appear to be in the same position as Plaintiff to assert any claim for relief.

      **SO ORDERED** at Green Bay, Wisconsin this  24th   day of August, 2015.

                                          s/ William C. Griesbach
                                          William C. Griesbach, Chief Judge
                                          United States District Court